## CONTINUATION OF SEARCH WARRANT

I, Alex Travers, being duly sworn, do hereby state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this continuation in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of the person of Laura Lynn Williams, also known as Laura Lynn Bermudez, described herein and in Attachment A, for the purpose of collecting deoxyribonucleic acid (DNA) samples from her person, further described in Attachment B.

2. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since 2022. I am currently assigned to the Detroit Division, Marquette Resident Agency. Prior to my employment with the FBI, I was a police officer for over eight (8) years in Cranston, Rhode Island where I served as a patrol officer, as a member of the department's Special Reaction Team, in temporary assignments with the department's Special Investigations Unit, and as a patrol sergeant.

3. As an FBI agent, I have investigated and assisted in the investigation of various types of federal criminal violations, including assaults in Indian Country.

4. My duties include the investigations of various violations of federal criminal law, including matters involving a violation of 18 U.S.C § 113(a)(6), 1151, 1153, assault resulting in serious bodily injury (the "**Target Offense**").

5. The facts in this continuation come from my personal observations, my training and experience, and information obtained from other agents, other law enforcement officers, and witnesses. This continuation is intended to show merely

there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6. Based on the facts set forth in this continuation, there is probable cause to believe violations of the **Target Offense** were committed by Williams. I submit this continuation shows there is probable cause to believe evidence, as further described in Attachment B will be found during a search of Williams, as further described in Attachment A.

**PROBABLE CAUSE**

7. On October 9, 2026, at approximately 10:53 p.m. Eastern Time, Hannahville Tribal Police and the Menominee County Sheriff's Office responded to a known location (the "Residence") in Wilson, Michigan, which is in the Northern Division of the Western District of Michigan, for a stabbing. Police arrived and found Victim, Witness, and Williams on a side porch of the Residence.

8. I reviewed records from the Hannahville Tribal Enrollment Department which showed that Victim and Williams are enrolled members of the Hannahville Indian Community, a federally recognized tribe. The U.S. Attorney's Office informs me that based on their enrolled status, Victim and Williams are Indians as defined by federal law. Based on my conversations with tribal police and their training and experience, I know the Residence is on land held in trust by the United States for the benefit of the Hannahville Indian Community. The U.S. Attorney's Office informs me that makes the property Indian Country for purposes of federal law.

9. Police observed Witness 1 rendering aid to Victim's left bicep and Williams lying on the ground next to a knife blade and handle, which were in separate pieces.



[1]




[1] Screenshot from Hannahville Tribal Police body camera footage

10. A deputy sheriff placed a tourniquet on Victim's arm to control her bleeding. Due to the severity of the injury, the deputy sheriff later transported Victim in his police vehicle to meet with the incoming ambulance instead of waiting for the ambulance to arrive at the Residence. Victim was transported to OSF St. Francis in Escanaba, Michigan and then flown via helicopter to UP Health System in Marquette, Michigan.



[2]

11. Hannahville Tribal Police arrested Williams on a tribal charge of aggravated assault and battery with a weapon and lodged her at the Delta County Jail. Michigan State Police responded to assist with evidence collection and collected the knife from the porch of the Residence:

[2] Screenshot from Menominee County Sheriff's Office body camera footage



12. On October 10, 2026, SA Richard Suda and I interviewed Witness 1. Witness 1 reported he consumed alcohol on October 9, 2026, which began earlier in the day. Witness 1 reported he was standing about 20 feet from the porch of the Residence and Williams and Victim were arguing. He explained Williams and Victim fought on the porch for about 30 seconds and ended when Williams went "limp." Victim told Witness 1 she was stabbed and Witness 1 observed a large amount of blood coming from Victim. Before the fight started, Witness 1 saw Williams with an object in her left hand. He was unable to identify what the object was at the time due to it being dark, but after the incident, he believed it was a knife based on what happened.

13. On October 10, 2026, SA Suda and I interviewed Williams at the Delta County Jail. I informed Williams of her Miranda Rights which she stated she

understood. Williams reported she and Victim playfully wrestled in the yard of the Residence. Williams explained she did not remember the incident because she was blackout drunk but wanted to be held accountable. Williams learned about Victim being stabbed after she made calls from jail to family/friends. Williams' friend told her Victim was out of surgery and medical staff had to remove a portion of Victim's intestine. Williams said she did not know what Victim was stabbed with. She also said she did not know where Victim was stabbed until the call from jail. Williams reported she was right-handed.

14. On October 13, 2026, SA Olivia Temrowski and I interviewed Victim at UP Health System. Victim was drinking alcohol on the night of the incident. Victim reported she and Williams playfully wrestled outside of the Residence and Victim went inside. Victim saw Williams with a knife in her hand at some point but did not remember the act of being stabbed or what led to it. I observed three (3) stab/slash wounds to Victim's upper left arm and one (1) stab/slash wound to her abdomen.

15. I believe the injuries Victim sustained because of the assault qualify as "serious bodily injury" under 18 U.S.C § 1365(3) as they created a substantial risk of death and protracted and obvious disfigurement.

16. I believe the knife may contain evidence, including trace evidence, which can be compared to William's DNA and other evidence collected in this case.

**<u>DNA TESTING AND THE COLLECTION OF DNA SAMPLES</u>**

17. Based on my training and experience, including discussions with other law enforcement officers, I know there are two (2) sources of DNA used in forensic

analyses. Nuclear DNA (nDNA) is typically analyzed in evidence containing blood, saliva, body tissue, and hairs that have tissue at their ends. Mitochondrial DNA (mDNA) is typically analyzed in evidence containing naturally shed hairs and hair fragments. When DNA evidence is transferred by direct or secondary (indirect) means, it remains on surfaces by absorption or adherence. In general, liquid biological evidence is absorbed into surfaces and solid biological evidence adheres to an object. Current DNA tests are so sensitive that they can type the DNA found in samples containing only a few cells. Merely touching an object may leave enough DNA material that a forensic analysis will be able to match the object to the person who touched it.

18. Buccal swabs provide the least invasive way to conduct DNA testing. A buccal swab is a cotton-tipped applicator that will be used to collect cheek cells from inside a person's mouth. The lab will then extract a person's DNA profile from the buccal swab, which will then be used for comparison purposes to the profile(s), if any, ultimately extracted from swabs collected from other evidence.

19. I propose to take the DNA samples sought herein in an entirely non-intrusive manner. Specifically, I seek to take "buccal," or cheek swabs from the inside of William's mouth by using cotton-tipped applicators (it is like a Q-tip) to rub the inside of William's cheeks. The buccal swabs take moments, involve no risk to health, no risk, trauma, or pain, and may be conducted in any other secure location.

20. I have been informed by the U.S. Attorney's Office it is well settled that the Fifth Amendment privilege against self-incrimination does not preclude the use

of one's body as evidence. *Schmerber v. California*, 384 U.S. 757, 765 (1985); *Wilson v. Collins*, 517 F.3d 421, 431 (6th Cir. 2008); *McVeigh v. Smith*, 872 F.2d 725, 727-28 (6th Cir. 1989). I have also been informed procedures such as these do not implicate the Sixth Amendment. *See, e.g., McVeigh*, 872 F.2d at 727.

21. Your affiant seeks to compare the DNA of Williams obtained under the authority of this search warrant to any DNA lawfully collected as part of this investigation.

## CONCLUSION

22. Based upon the information above, your affiant submits there is probable cause to believe violations of the **Target Offense** was committed and the items described in Attachment B are evidence of these violations and the items described in Attachment B are likely to be found within the property or person described in Attachment A. I request the Court issue a warrant authorizing a search of Williams who is described in Attachment A for the items described in Attachment B.